IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STANLEY R. TSUJI, | ) CIVIL NO.  14-00206 JMS-BMK |
| | ) |
| Plaintiff, | ) ORDER (1) GRANTING DEFENDANT |
| | ) KAMEHAMEHA SCHOOLS' MOTION |
| vs. | ) FOR SUMMARY JUDGMENT, DOC. |
| | ) NO. 56; AND (2) DENYING |
| KAMEHAMEHA SCHOOLS, | ) PLAINTIFF STANLEY TSUJI'S |
| | ) COUNTER MOTION FOR SUMMARY |
| Defendant. | ) JUDGMENT, DOC. NO. 61 |
| _____ | ) |

**ORDER (1) GRANTING DEFENDANT KAMEHAMEHA SCHOOLS'
MOTION FOR SUMMARY JUDGMENT, DOC. NO. 56; AND
(2) DENYING PLAINTIFF STANLEY TSUJI'S COUNTER MOTION FOR
SUMMARY JUDGMENT, DOC. NO. 61**

## I.  INTRODUCTION

Plaintiff Stanley R. Tsuji ("Plaintiff" or "Tsuji") was employed as a
security guard with Defendant Kamehameha Schools ("Defendant" or
"Kamehameha Schools").  Defendant terminated Plaintiff's employment after he
was found sleeping while on duty, and then allowed those who woke him up to
enter the campus without verifying their identities.  In this action, Plaintiff,
proceeding pro se, asserts claims against Defendant for violation of his "rights as
an employee . . . under numerous State and Federal Statutes," alleging he "suffered
a [m]edical [r]elapse at work" and was thereafter "illegally [t]erminated" from his

employment.  Doc. No. 1-1, Compl. ¶¶ at 1-2.  Currently before the court is

Defendant's Renewed Motion for Summary Judgment, Doc. No. 56, and

Plaintiff's Counter Motion for Summary Judgment.  Doc. No. 61.  For the

following reasons, Defendant's Motion is GRANTED and Plaintiff's Counter

Motion is DENIED.

## II.  <u>BACKGROUND</u>

### A.    Factual Background

The factual background is derived from Defendant's Concise

Statement of Facts ("CSF"), Doc. No. 57, supported by evidence primarily

consisting of (1) a Declaration of Lyan Bonn, an employee relations specialist at

Kamehameha Schools, Doc. No. 57-8; (2) a Declaration of Michael Moses,

Captain of Security at Kamehameha Schools, Doc. No. 57-9; (3) personnel

documents disclosed by Defendant, Doc. No. 57-3; (4) Plaintiff's deposition

testimony, and related deposition exhibits, Doc. No. 57-4, and (5) Plaintiff's

redacted medical records.  Doc. No. 57-5.

In response, Plaintiff submitted several exhibits that largely duplicate

evidence already submitted by Defendant.  Plaintiff did not, however, file a

counter-statement of facts (a "separate document containing a single concise

statement that admits or disputes the facts set forth" in Defendant's CSF) as

instructed and as required by Local Rule ("LR") 56.1(b).  But given Plaintiff's pro se status, the court construes Plaintiff's (1) "Exhibit[s] 1 through 6," Doc. No. 59, and (2) "2nd Motion in Opposition to Defendant's 2nd Motion for Summary [Judgment]," Doc. No. 61, as his response to Defendant's CSF.  With that explanation, the court sets forth the facts, construing the evidence in the light most favorable to the Plaintiff when considering Defendant's Motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

Tsuji worked as a security guard for Kamehameha Schools from February 26, 2007 until his termination on November 25, 2013.  Doc. No. 57-3 at 13-14, Def.'s Ex. A at KS-00013-14 (hiring letter); Doc. No. 57-4 at 82, Tsuji Dep. Ex. 10 at KS-00050 (termination letter).[1]  After he was hired, he answered a questionnaire asking whether he was a disabled veteran, or whether he was "an individual with a disability," to which he responded no to both questions.  Doc. No. 57-4 at 7, Tsuji Dep. at 23; *id.* at 69, Tsuji Dep. Ex. 2 at KS-00102.

---

[1]  Defendant's CSF indicates a termination date of November 30, 2013, Doc. No. 57, Def.'s CSF ¶ 1, but his termination letter states that his employment "is terminated, effective today, November 25, 2013."  Doc. No. 57-4 at 82, Tsuji Dep. Ex. 10 at KS-00050.

According to his termination letter, Tsuji was terminated because he was "sleeping at the . . . main campus gate in general view of the public, while on-duty during restricted campus hours[.]"  Doc. No. 57-4 at 82, Tsuji Dep. Ex. 10 at KS-00050.  The termination letter also states:

> Prior to this incident, you have been disciplined on previous occasions for the following:
>
> •    March 2012 -- Falsified security logs on nine (9) occasions, suspended for five (5) working days without pay and notified of a Final Written Warning.
>
> •    June 20, 2012 -- Observed sleeping on-duty, suspended for three (3) days without pay.  Suspension rescinded to verbal counsel[ing] on September 12, 2012.

*Id.* at 83, Tsuji Dep. Ex. 10 at KS-00051.

And Tsuji's employment records document that in fact he had been suspended for five days (and had been given a final written warning) after an investigation determined that he had falsified security logs in violation of Defendant's code of conduct and employee handbook.  *See* Doc. No. 57-4 at 80-81, Tsuji Dep. Ex. 9.  Tsuji also acknowledged that he had been suspended with pay for three days after others observed him sleeping while in a security truck (although the suspension was later rescinded).[2]

---

[2]  In June 2012, Tsuji had been charged with sleeping in uniform in a security vehicle, but
(continued...)

4

Tsuji also does not dispute that he was sleeping during a midnight or "graveyard" shift on October 29, 2013.[3]  Doc. No. 57-4 at 19-20, Tsuji Dep. at 71-77.  A Kamehameha Schools investigation, based on statements and pictures from employees of a private contractor (who observed Tsuji), concluded that Tsuji was sleeping at the main gate, and, when awakened, "opened the gate arm without verifying the identification of [those entering the gate]."  Doc. No. 57-4 at 86, Tsuji Dep. Ex. 11 at KS-00126.  "There was sufficient cause to believe that Tsuji had been sleeping in the guard house at approximately 12:40 [a.m.] on October 29, 2013, while on duty and not on any approved break."  Doc. No. 57-9, Moses Decl. ¶ 4.  There was "sufficient cause to believe that Tsuji had admitted persons to [Kamehameha Schools'] campus -- without checking their identification or logging their entrance to campus -- at or around that time after they [woke] him up."  *Id.*

---

[2](...continued)
the suspension based on that incident was rescinded after Tsuji contended that he was on a work break at the time.  Doc. No. 57-4 at 73, Tsuji Dep. Ex. 7; Doc. No. 57-4 at 16-17, Tsuji Dep. at 59-62.  Tsuji was nevertheless "counseled that it is inappropriate to sleep or to give the impression of sleeping in a public area as the expectation is security officers should be available to respond to emergencies and set a good example for others."  Doc. No. 57-4 at 73, Tsuji Dep. Ex. 7; Doc. No. 57-4 at 16, Tsuji Dep. at 58.  Tsuji acknowledged that "it's common sense that you're not going to sleep right in broad daylight in front of the public [or at night]."  Doc. No. 57-4 at 17, Tsuji Dep. at 65.

[3]  During this October 2013 period, Tsuji was also working part-time at the Honolulu International Airport from 3:30 p.m. to 11:00 p.m.  Doc. No. 57-8, Bonn Decl. ¶ 8; Doc. No. 57-4 at 26, Tsuji Dep. at 98.

5

Tsuji's termination letter found him in violation of an employee handbook and a code of conduct stating:

- "Any conduct which is disloyal, disruptive, competitive, or damaging to [Kamehameha Schools] will not be permitted."

- "The safety and security of employees, students, and visitors will be of the highest importance when on [Kamehameha Schools] premises or at [Kamehameha Schools] sponsored events."

- "Any form of dishonesty and/or personal, immoral or unethical conduct on or off the job which gives the appearance of wrongdoing which could discredit [Kamehameha Schools]; falsifying or altering employment, time or other [Kamehameha Schools] records will not be tolerated."

Doc. No. 57-4 at 83, Tsuji Dep. Ex. 10 at KS-00051. He was also found in violation of "KS Procedure 410.10B -- Discipline, Section J. Examples of Unacceptable Conduct," which states:

14. "Taking unauthorized breaks or otherwise leaving the assigned work area without providing notice . . . stopping work early without permission; sleeping, giving the appearance of sleeping, or loafing on duty."

*Id.*

Tsuji contends that he is under a doctor's care, and was at the time of the October 2013 incident. Doc. No. 59, Pl.'s "Amended Pleadings" ¶ 1. He

6

relies on a June 24, 2011 letter from Sarah J. Seabolt, M.D. (which was provided

to Kamehameha Schools in June 2011) stating that "Mr. Stanley Tsuji is under my

care.  He reports exhaustion because of night shift work.  Please consider reducing

his work from 5 days a week to 3-4 days a week."  Doc. No. 59-1, Pl.'s Ex. 1.

Previously, on May 25, 2011, Tsuji had sought a schedule change from full-time

to part-time.  Doc. No. 57-8, Bonn Decl. ¶ 2.  At that time, he was asked if this

was a request for a reasonable accommodation under the ADA, and he responded

"no."  Doc. No. 57-4 at 8-9, Tsuji Dep. at 26, 29, 30; Doc. No. 57-8, Bonn Decl.

¶ 2.  Nevertheless, after Kamehameha Schools received Dr. Seabolt's June 24,

2011 letter, "Tsuji was allowed to reduce his weekly work schedule to three first

watch (11pm-7:45 am) shifts," Doc. No. 57-8, Bonn Decl. ¶ 3, that is, three days a

week.

On July 22, 2011, Dr. Seabolt wrote to Kamehameha Schools that

Tsuji's "health has improved significantly with his present work schedule.  Based

on this improvement, I feel it would now be reasonable to add work on the 'first

watch' Saturday, Sunday and Monday and on the '2nd watch' Wednesday and

Thursday."  Doc. No. 59-2, Pl.'s Ex. 2.  Kamehameha Schools accommodated this

request to *increase* Tsuji's workload, determining that it "could provide a schedule

to Tsuji nearly identical to that recommended by this most recent doctor's note."

Doc. No. 57-8, Bonn Decl. ¶ 5.

Tsuji proffers no other evidence that could have indicated to Kamehameha Schools that he was disabled, at least until *after* the October 2013 sleeping incident.  Tsuji testified at his deposition that between July or August of 2011 (when he discussed a modified work shift) until October of 2013 (when he was found sleeping on the job), he never spoke to anyone at Kamehameha Schools regarding a medical condition, a disability, or "problems with midnight shift work or problems with staying awake on duty."  Doc. No. 57-4 at 24, Tsuji Dep. at 92-93; *see also id*. at 85 ("Nothing else was said to anybody else."); *id*. at 101 (agreeing that between those two events, Tsuji had not discussed feeling exhausted with anyone at Kamehameha Schools).

Tsuji argues that he "ha[d] given the Defendant[] notice of his Midnight shift disability . . . which the Defendant[] acknowledge in their . . . Exhibits 4 and 5, which documents and acknowledges by Dr. Sarah J. Seabolt M.D. that the Plaintiff suffered a 40% Midnight shift disability, and further diagnosed the Plaintiff with a 100% Midnight shift disability[.]"  Doc. No. 61, Pl.'s Opp'n ¶ 3.  He claims a violation of the Americans with Disabilities Act ("ADA"), appearing to argue that some type of vog sensitivity constitutes a

disability.[4]  *See id.* at 5 ¶ 5 (arguing that "Plaintiff has demonstrated that Vog-Sulfuric Dioxide Emissions further hampered and compounded the detriment of his work ability at Kamehameha Schools").[5]

Tsuji provides (1) a document dated December 3, 2013 (after his termination), apparently submitted for unemployment purposes where he stated that he had an "[i]mpairment from prolonged midnight shift," Doc. No. 59-3, Pl.'s Ex. 3 at 1, and (2) a December 30, 2013 document from Dr. Seabolt writing that Tsuji's "illness or disability" is "chronic fatigue," and that a limitation is "[n]o midnight shifts."  *Id.* at 2.  He also contended on November 8, 2013 during an investigation of the sleeping incident (prior to his termination) that he was "still under doctor's care for my work schedule."  Doc. No. 57-9, Moses Decl. ¶ 6.  He also claimed during the investigation on November 8, 2013 that:

> Also . . . Kona wind weather and Heavy Vog like we've
> been experiencing the last several weeks . . . at times
> tends to substantially fatigue me greatly, depending on

---

[4]  The term "vog" is defined as "air pollution caused by volcanic emissions."  *See* www.merriam-webster.com/dictionary/vog (last visited Dec. 21, 2015).

[5]  In response to a previous motion for summary judgment, Tsuji specifically contended that "vog or sulfuric dioxide from volcanic emissions from the Big Island of Hawaii is scientifically and medically recognized as a carcinogen to include . . . respiratory distress, fatigue and to include death in some individuals," and is "medically recognized as a Disability."  Doc. No. 29, Pl.'s Mem. at 2 (emphasis omitted).  He did not reassert that specific argument in response to the current motion, although he clearly asserts a general violation of the ADA.  Doc. No. 61 at 4, Pl.'s Counter Motion ¶ 4.

the level of the Vog and Sulfur Dioxide level in the
Atmosphere.  Making it [at] times difficult to gauge my
stamina.  Not using this as an excuse but a contributing
factor.

Doc. No. 57-4 at 102-03, Tsuji Dep. Ex. 11 at KS-00142-43.

After the investigation, Kamehameha Schools followed up on Tsuji's

November 8, 2013 statements regarding medical care.  Doc. No. 57, Def.'s CSF

¶ 20.  A meeting was held on November 18, 2013 with Kamehameha Schools'

Security Captain, Michael Moses; Employee Relations Specialist Lyan Bonn;

Administrator B.J. Mau; and Tsuji.  Doc. No. 57-8, Bonn Decl. ¶ 8; Doc. No. 57-4

at 110, Tsuji Dep. Ex. 15.  During that meeting, Tsuji admitted that "even though

he had told [Moses] in his November 8, 2013 written statement that he was still

under a doctor's care, in fact he had not been under a doctor's care for exhaustion

since 2011 when he requested the schedule he was working until his termination,

and . . . that he had never sought medical care concerning Vog symptoms."  Doc.

No. 57-9, Moses Decl. ¶ 8; *see also* Doc. No. 57-8, Bonn Decl. ¶ 9 ("Tsuji

confirmed that an earlier statement on November 8, 2013 to Moses, that he was

under a doctor's care for his work schedule, was false and that he had neither been

under his doctor's care since 2011 nor sought medical care regarding Vog

symptoms.").  Specifically, when Tsuji was asked on November 18, 2013 about

10

his claim of exhaustion, he responded as follows:

> Tsuji claimed he had no reason for concern -- medical or
> otherwise -- regarding his possible exhaustion prior to
> the reported sleeping incident on October 29, 2013.  In
> retrospect, he now surmises that VOG and the lack of
> trade winds may have contributed to his feeling
> exhausted which resulted in his reported sleeping on the
> job on October 29. . . .  When asked, Tsuji confirmed he
> hasn't sought nor is he under a doctor's care for any
> symptoms associated with the VOG nor has he been
> under a doctor's care since 2011.

Doc. No. 57-4 at 111, Tsuji Dep. Ex. 15 at KS-00148.  Tsuji has not contradicted

Bonn's or Moses' testimony that he had not sought medical care for vog-related

symptoms before November 2013, and the record at the time of termination

contains no medical evidence of such a condition.

Tsuji, however, submits (1) a doctor's certificate dated December 4,

2014 (over a year *after* his termination) stating that he "suffers allergic rhinitis

aggravated by VOG, requests indoor assignment," Doc. No. 61-5, Pl.'s Ex. 4, and

(2) a new note from Dr. Seabolt dated December 17, 2014 addressed to "whom it

may concern" stating that Tsuji "has a moderately severe reaction to the sulfur

dioxide in vog" and requesting "indoor duties."  Doc. No. 61-6, Pl.'s Ex. 5.

///

///

**B.     Procedural Background**

On November 3, 2014, Defendant filed a Motion for Summary

Judgment (the "First Motion").  Doc. No. 26.  After reviewing the record, the court

raised two questions that had not been fully briefed:

> First, whether Plaintiff could have been "disabled" as
> defined under 42 U.S.C. § 12102(1) of the ADA (as
> interpreted after the ADA Amendments Act of 2008
> ("ADAAA")), given information as to fatigue and vog
> sensitivity that may have come to light during
> Defendant's November 2013 investigation of Plaintiff's
> conduct.  *See, e.g.*, *Vanhorn v. Hana Grp., Inc.*, 979 F.
> Supp. 2d 1083, 1092 (D. Haw. 2013) (recognizing a
> lower standard for "disability" after the ADAAA (citing
> 29 C.F.R. § 1630.2(j)(1)); and
>
> Second, whether Defendant complied with requirements
> to engage in an "interactive process" after that
> investigation.  *See, e.g.*, *U.S. E.E.O.C. v. UPS Supply
> Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010)
> (explaining employer's duty to engage in an interactive
> process to determine reasonable accommodations);
> *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062
> (7th Cir. 2014) (applying interactive-process analysis to
> employee with sleeping and alertness issues during night
> shifts).

Doc. No. 36.  Ultimately, however, the court simply denied the First Motion

without prejudice (making no rulings on any issue), and referred the case to a

Magistrate Judge to assist Plaintiff with obtaining pro bono counsel for purposes

of possibly resolving the action short of a motion or trial.  Doc. No. 37.  Efforts at

such a resolution failed, and Defendant filed its Renewed Motion for Summary Judgment on October 30, 2015.  Doc. No. 56.  It accompanied its Motion with a Concise Statement of Facts, and evidence (much of which is undisputed) supporting its Motion.  Doc. No. 57.

On November 20, 2015, Plaintiff filed several documents entitled "Amended Pleadings," Doc. No. 59, which the court construed as a filing related to the Renewed Motion for Summary Judgment.  Doc. No. 60.  On November 30, 2015, Plaintiff also filed a "2nd Motion in Opposition to Defendant's 2nd Motion for Summary Judgment," Doc. No. 61, as well as a "2nd Countermotion for Summary Judgment."  *Id.*  Defendant filed a Reply (also including an Opposition to the Countermotion) on December 7, 2015.  Doc. No. 63.  The court decides the Motions without a hearing under Local Rule 7.2(d).

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

13

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

> "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

> "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the

14

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.  **DISCUSSION**

The only claim that Plaintiff exhausted with the Equal Employment

Opportunity Commission was discrimination based on disability.  *See* Doc. No.

57-4 at 112, Tsuji Dep. Ex. 16.  Accordingly, although Plaintiff's Complaint

alleges violations of his "rights as an employee . . . under numerous State and

Federal Statutes," the court construes the Complaint as alleging claims under the

ADA and an equivalent state-law claim (Hawaii Revised Statutes ("HRS") § 378-

2(a)(1)(A)).[6]  The court addresses each claim in turn.

///

///

---

[6]  HRS § 378-2(a)(1)(A) makes it an unlawful discriminatory practice "[f]or any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's disability.

> [B]ecause the definitions of disability in the ADA and HRS § 378-2 are substantially identical, the Hawaii Supreme Court has expressly adopted 'the [ADA] analysis for establishing a prima facie case of disability discrimination under HRS § 378-2,'" "and looks 'to the interpretations of analogous federal laws by the federal courts for guidance.'"

*Vanhorn v. Hana Grp., Inc.*, 979 F. Supp. 2d 1083, 1090 n.5 (D. Haw. 2013) (quoting *Thorn v. BAE Sys. Haw. Shipyards, Inc.*, 586 F. Supp. 2d 1213, 1219 (D. Haw. 2008)).   "Accordingly, the court sets forth a single framework for Plaintiff's claims pursuant to the ADA and HRS § 378-2." *Id.*

A.      **The ADA**

Title I of the ADA, 42 U.S.C. § 12112(a), prohibits an employer from

discriminating "against a qualified individual on the basis of disability in regard to

job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges

of employment."  The court applies the burden-shifting analysis derived from

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Raytheon Co.*

*v. Hernandez*, 540 U.S. 44, 49-50 (2003) (applying *McDonnell Douglas* burden

shifting framework to ADA disability discrimination claim); *Thorn v. BAE Sys.*

*Haw. Shipyards, Inc.*, 586 F. Supp. 2d 1213, 1218-19 (D. Haw. 2008).[7]

Under this burden-shifting analysis, Plaintiff must first establish a

prima facie disability discrimination claim.  *See, e.g.*, *Raytheon*, 540 U.S. at 49

n.3.  Plaintiff must put forth evidence that: (1) he is "disabled" within the meaning

of the statute; (2) he is a "qualified individual" (that is, he is able to perform the

essential functions of his job, with or without reasonable accommodations); and

---

[7] "[W]hen responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]."  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)).  The court proceeds under the *McDonnell Douglas* framework because Plaintiff has presented no direct or circumstantial evidence demonstrating any discriminatory reason for his termination.

(3) he suffered an adverse employment action "because of" his disability.  *See, e.g.*, *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001).  "At the summary judgment stage, the 'requisite degree of proof necessary to establish a *prima facie* case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence.'"  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

If Plaintiff establishes his prima facie case, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its employment action.  *Raytheon*, 540 U.S. at 49 n.3.  If Defendant proffers such a reason, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual."  *Id*. (citation omitted).  Applying this legal framework, Plaintiff's claim of disability discrimination fails.

**B.    Application of ADA Standards**

> ***1.    Prima Facie Case -- No Evidence of a Disability During the Relevant Period***

The ADA defines disability with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being

17

regarded as having such an impairment[.]"  42 U.S.C. § 12102(1).[8]

        A reasonable jury could not conclude that Tsuji had a physical or mental impairment that substantially limited a major life activity (much less that he was regarded as having such an impairment) when he was terminated.  Some evidence indicates that Tsuji was being treated in 2011 for exhaustion or fatigue -- a condition that, according to Tsuji's doctor, was the result of night shift work.  *See* Doc. No. 29-1, Pl.'s Ex. 1 ("He reports exhaustion because of night shift work.").  But this condition could not "substantially limit" a "major life activity," such as working or sleeping, for purposes of the ADA.  According to his doctor, Tsuji's exhaustion did not render him unable to work night shifts; on the contrary, his night-shift work was causing the exhaustion.

---

        [8]  "An impairment 'substantially limits' a major life activity when an individual is either unable to perform a major life activity or is 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person in the general population.'"  *Vanhorn,* 979 F. Supp. 2d at 1092 (quoting 29 C.F.R. § 1630.2(j)(1)).  *Van Horn* recognized that, after the ADA Amendments Act ("ADAAA") of 2008, the term "substantially limits" "shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA."  *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(iv)).  *See* 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard.")
        Current regulations indicate that "episodic" impairments can constitute a disability.  *See* 29 C.F.R. § 1630.2(j)(1)(vii) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.").

Tsuji argues that he had a "midnight shift disability," Doc. No. 61 at 4, Pl.'s Counter Motion ¶ 3, and thus Kamehameha Schools "could have adjusted the Plaintiff's shift to all dayshifts or evening shifts or some type of job retraining or work transfer." *Id.* ¶ 2.  But a "midnight shift" is not a "physical or mental condition" that substantially limits a major life activity.  Plaintiff thus appears to contend that fatigue or exhaustion prevents him from working midnight shifts.  But "suffering from fatigue cannot qualify as a major life activity." *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 300 (S.D.N.Y. 2003).  Thus, "[m]ere allegations of fatigue are . . . not sufficient to demonstrate that [someone] is disabled under the ADA; rather [a plaintiff] must identify how fatigue has substantially limited a particular major life activity." *Boitnott v. Corning Inc.*, 2010 WL 2465490, at *6 (W.D. Va. June 15, 2010).[9]

Here, there is no specific evidence of how Tsuji's fatigue significantly restricted a major life activity -- there is no evidence, for example, indicating that Tsuji's "midnight shift disability" prevented him from staying awake in general, much less from working any late-night or graveyard shifts.

_____

[9] There is no evidence that Tsuji suffered from "chronic fatigue syndrome," which could constitute a disability causing a substantial limitation on major life activity. *See, e.g.*, *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615-16 (5th Cir. 2009).  But fatigue standing alone is not enough to establish a disability for present purpoes.

Indeed, his doctor initially simply recommended *fewer* late shifts, and -- when

accommodated as she and Tsuji requested -- his doctor told Kamehameha Schools

a month later that his "health has improved significantly with his present work

schedule," Doc. No. 59-2, Pl.'s Ex. 2, and requested *additional* late schedules be

added. *Id.* ("Based on this improvement, I feel it would now be reasonable to add

work on the 'first watch' Saturday, Sunday and Monday and on the '2nd watch'

Wednesday and Thursday.").[10]  Moreover, Tsuji testified at his deposition that he

never told Kamehameha Schools that he could not do "midnight shift work" after

August 2011 (when he requested a part-time schedule) and before October 2013

(when he was found sleeping on the job).  Doc. No. 57-4 at 27, Tsuji Dep. at 102.

Aside from fatigue, the record contains evidence that Tsuji told

Kamehameha Schools on November 8, 2013, during the investigation into the

October 2013 sleeping incident (and shortly before his termination) that he was

"still under doctor's care for my work schedule[.]"  Doc. No. 57-4 at 102, Tsuji

Dep. Ex. 11 at KS-00142.  Tsuji also told Kamehameha Schools during the

---

[10]  Lyan Bonn indicates that, after receiving the July 2011 note from Tsuji's doctor, "[o]ut of an abundance of caution [Kamehameha Schools] elected to treat [it] as a request for reasonable accommodation[.]"  Doc. No. 57-8, Bonn Decl. ¶ 5.  Kamehameha Schools thus provided a work schedule in accordance with Tsuji's doctor's recommendations and as agreed to by Tsuji.  *Id.* ¶¶ 5-6.  This accommodation does not, however, mean that Tsuji was "regarded as" disabled by Kamehameha Schools.  *See Thorn*, 586 F. Supp. 2d at 1224 n.9 ("[T]he fact that an employer provides some accommodation to an employee is not a concession that the employer views the employee as disabled.") (citations omitted).

investigation that "Heavy Vog" "at times tends to substantially fatigue me greatly depending on the level of the Vog and Sulfur Dioxide level[.]" *Id.* But the record is undisputed that Kamehameha Schools did not ignore Tsuji's statements regarding vog -- it followed up at another meeting on November 18, 2013, where Tsuji clarified that he had not been under his doctor's care for exhaustion since 2011, and had never been under medical care for a vog-related condition. Rather, Tsuji "surmise[d] that [vog] and the lack of trade winds may have contributed to his feeling exhausted." Doc. No. 57-4 at 111, Tsuji Dep. Ex. 15 at KS-00148. Thus, even assuming that vog sensitivity can in some circumstances cause disabling conditions, there is no evidence in this case that he had such a disability in November 2013 (nor that Kamehameha Schools could have known when it terminated him that Tsuji had such a disability). Even considering the relatively low standard upon which to assess whether a condition "substantially limits" a major life activity under the ADAAA, the record establishes no question of fact as to whether Tsuji could have been considered "disabled" for purposes of the ADA.[11]

---

[11]   To be clear, the court is not relying on evidence of symptoms or treatment *after* Tsuji's termination. *See, e.g.*, *Raytheon*, 540 U.S. at 54 n.7 ("The Court of Appeals did not explain, however, how it could be said that [the employer] was motivated to reject respondent's application because of his disability if [the employer] was entirely unaware that such a disability existed. If [the employer was] truly unaware that such a disability existed, it would be

(continued...)

## 2.   *Prima Facie Case -- Plaintiff Was Not a "Qualified Individual with a Disability"*

Moreover, even if Plaintiff could establish that he was disabled for purposes of the ADA, he cannot establish that he is a "*qualified* individual with a disability." "The ADA [] defines . . . 'qualified individual with a disability,' as an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Nunes v. Wal-Mart, Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12111(8)). "To determine the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs." *Basith v. Cook Cty.*, 241 F.3d 919, 927 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(3)).[12]

---

[11](...continued)
impossible for [the employment] decision to have been based, even in part, on respondent's disability."). For example, a document from his doctor stating "no midnight shifts" (not directed to Kamehameha Schools) is dated December 30, 2013. Similarly, Tsuji's recent evidence of "allergic rhinitis aggravated by VOG" is based on a visit of December 4, 2014 -- over a year *after* he was found sleeping and well after his November 2013 termination. Doc. No. 59-4, Pl.'s Ex. 4.

[12]   29 C.F.R. § 1630.2(n) provides:

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The

(continued...)

Further, "[t]he function may be essential because the reason the position exists is to perform that function."  29 C.F.R. § 1630.2(n)(2)(i).  An employer has the burden to come forward with evidence of a job's essential functions, in part because "much of the information which determines those essential functions lies uniquely with the employer."  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 911 (9th Cir. 2007) (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)).

---

[12](...continued)
term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

Kamehameha Schools produces evidence establishing an obvious requirement that remaining awake is an essential function of Tsuji's job as a security guard. *See* Doc. No. 57-4 at 73, Tsuji Dep. Ex. 7 at KS-00063 (indicating that Tsuji was "counseled that it is inappropriate to sleep or give the impression of sleeping in a public area as the expectation is the security officers should be available to respond to emergencies and set a good example for others"); Doc. No. 57-4 at 83, Tsuji Dep. Ex. 10 at KS-00051 (reiterating "KS Procedure 410.10B" that "sleeping [or] giving the appearance of sleeping" is unacceptable conduct). And Tsuji offers no evidence *disputing* that remaining awake is an essential function of a security officer with Kamehameha Schools. Indeed, he admits that it is "common sense" that a security officer should not sleep on the job. Doc. No. 57-4 at 17, Tsuji Dep. at 65.

Here, although not clear, Plaintiff's theory would be premised on him having a medical condition that prevents or interferes with his ability to stay awake while on duty. Under this theory, he could not perform an indispensable function of a security guard at Kamehameha Schools -- remaining alert and awake while on duty. *See, e.g.*, *Smith v. Sturgill*, 516 F. App'x 775, 776 (11th Cir. 2013) ("Smith testified that she . . . had trouble staying awake as a result of sleep apnea. Accordingly, she was unable to fulfill the essential functions of a Security Officer

24

as established by the job posting and affidavits from Weiser management.");

*Roetter v. Mich. Dep't of Corr.*, 456 F. App'x 566, 570-71 (6th Cir. 2012)

(concluding that a prison employee with narcolepsy with "security duties"

requiring "the ability to remain alert" as an essential function was not "otherwise

qualified" under the ADA); *cf. Gonzalez v. Allied Barton Sec. Servs.*, 2010 WL

3766964, at *5 (S.D.N.Y. Sept. 7, 2010) (concluding that a security officer that

violated an employer's policy against sleeping on the job, with primary duties

including remaining alert and aware of surroundings, was not satisfactorily

performing her job); *Donohue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir.

2000) (concluding that a person with a condition that prevented being conscious

and alert at all times was not qualified to be a train dispatcher); *Trawick v.

Hantman*, 151 F. Supp. 2d 54, 61 (D.D.C. 2001) (finding no disability

discrimination where "staying awake while on duty [was an] essential function[]

of a [boiler plant worker] position").

　　　　　In short, because Tsuji fails to satisfy this element of the prima facie

case of disability discrimination, Kamehameha Schools is entitled to summary

judgment in its favor.[13]

---

[13]  Given this finding that Tsuji was not a qualified person with a disability, the court need
not proceed with the next step of the prima facie analysis, *i.e.*, whether he was terminated

(continued...)

> **3.**      ***No Failure to Accommodate or Violation of an Obligation to Engage in an Interactive Process***

During proceedings on the First Motion, the court raised a question regarding the interactive process after Tsuji mentioned a possible vog-related condition on November 8, 2013.  Doc. No. 36; *see, e.g.*, *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (holding that "the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation"), *overruled on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

*Barnett* explains that an employer's obligation to engage in an interactive process is "triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation."  *Id.* at 1112; *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).  Likewise, however, there is no obligation to

---

[13](...continued)
"because of" his disability.  Nevertheless, even assuming that Tsuji had a vog-related condition in November 2013, there is no evidence that such a condition caused him to fall asleep (and thus that his "disability" caused a symptom for which he was terminated).  Again, at best, Tsuji was *surmising* that vog and a lack of trade winds contributed to exhaustion.  Given a lack of evidence of actual causation between vog and Tsuji's workplace failure, there necessarily is no proof that Tsuji's November 2013 termination was "because of" any vog sensitivity that he might have had.

26

explore possible accommodations unless an employer knows about an employee's disability. *See, e.g.*, 29 C.F.R. § 1630.9(a) ("It is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified . . . employee with a disability[.]").

Applied here, Kamehameha Schools had no reason to engage in an interactive process. The record establishes that Tsuji told Kamehameha Schools on November 8, 2013 that he was under a doctor's care for exhaustion and had a vog-related condition that "at times tends to substantially fatigue me greatly." Doc. No. 57-9, Moses Decl. ¶ 6. But, after further inquiry, Tsuji admitted on November 18, 2013 that his statement about being under a doctor's care was false (at least since 2011), and that he only "surmised" that vog might have contributed to his exhaustion. That is, Kamehameha Schools could not, at that time, have recognized a need for an accommodation for a disabled person.

In any event, *Barnett* also makes clear that there is no stand-alone claim for failure to engage in the interactive process. Rather, it held that "employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Id.* at 1116. *See also, e.g.*, *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 n.1 (7th Cir. 2014) ("Failure of the interactive process is

not an independent basis for liability under the ADA.  An employee must still show that she is a 'qualified individual with a disability' and that a reasonable accommodation would have allowed her to perform the essential functions of her job.") (citations omitted).  That is, "failure to engage in [the interactive] process is not itself evidence of failure to reasonably accommodate.  There must first exist a reasonable accommodation that will enable the employee to perform the essential functions of the position."  *Kramer v. Tosco Corp.*, 233 F. App'x 595, 596 (9th Cir. 2007) (mem., cited as persuasive authority) (citation omitted).  This is because "[i]f a disabled person cannot perform a job's essential functions (even with a reasonable accommodation), then the ADA's employment protections do not apply."  *Cripe v. City of San Jose*, 261 F.3d 877, 884 (9th Cir. 2001).  Accordingly, given the conclusion that Plaintiff was not a *qualified* individual with a disability, Kamehameha Schools cannot be liable for failing to engage in an interactive process.

### 4. *Tsuji Also Fails to Meet Other Requirements of the* McDonnell Douglas *Burden-shifting Analysis*

What's more, even if the record could establish a prima facie case of disability discrimination, Kamehameha Schools would still be entitled to summary judgment on Tsuji's ADA claim based on the next steps of the *McDonnell*

*Douglas* analysis.

Kamehameha Schools has given a legitimate, non-discriminatory reason for terminating Tsuji -- Tsuji's violation of job duties and work procedures, by his falling asleep on the job and allowing persons on the school campus without verifying their identities, and having had a prior incident of falsifying security logs.  And Tsuji has no evidence that could possibly indicate that his termination was pretext for illegal discrimination.  *Raytheon*, 540 U.S. at 49 n.3 ("The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action.  If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.") (citing *McDonnell Douglas*, 411 U.S. at 802).

For example, Tsuji has no "specific" and "substantial" evidence "that the employer's proffered motive[ ] [was] not the actual motive[ ] because [it is] inconsistent or otherwise not believable."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).  He has no evidence that the reasons given are "unworthy of credence," *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

143 (2000)), or "other circumstantial (as well as direct) evidence from which a reasonable jury could conclude that the employee's disability actually motivated the [termination] decision." *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)).

In sum, absent any evidence that could be construed as pretextual, Tsuji's ADA claim would fail even if he could establish a prima facie case. Accordingly, Kamehameha Schools is entitled to summary judgment on Tsuji's disability claims under the ADA. The same result follows to the extent Tsuji is making a similar claim under HRS § 378-2. *See Vanhorn*, 979 F. Supp. 2d at 1090 n.5 (applying ADA framework to HRS § 378-2 disability claim). It necessarily follows that Tsuji cannot prevail on his Counter Motion for Summary Judgment, which seeks a ruling as a matter of law that he was the victim of unlawful discrimination.

## C.    Retaliation Under the ADA

Next, although the basis is not entirely clear, Tsuji appears also to be claiming retaliation. *See* Doc. No. 61, Pl.'s Counter Motion ¶ 4 ("The Defendant's representatives . . . violated their fiduciary duties. . . when they [i]llegally and [w]rongfully [terminated] the Plaintiff's employment violating the [ADA] and other federal civil rights violations under Conspiracy and Retaliation."). Such a

claim fails.

The ADA contains the following anti-retaliation provision:

No person shall discriminate against any individual
because such individual has opposed any act or practice
made unlawful by this chapter or because such individual
made a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing under
this chapter.

42 U.S.C. § 12203(a).  "To establish a prima facie case of retaliation under the

ADA, an employee must show that: (1) he or she engaged in a protected activity;

(2) suffered an adverse employment action; and (3) there was a causal link

between the two."  *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 849 (9th Cir.

2004) (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003)).

"If the employee establishes a prima facie case, the employee will avoid summary

judgment unless the employer offers legitimate reasons for the adverse

employment action, whereupon the burden shifts back to the employee to

demonstrate a triable issue of fact as to whether such reasons are pretextual."  *Id*.

(citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)).

Tsuji fails to establish a prima facie case of retaliation.  There is no

evidence he was engaged in a "protected activity."  He did not, for example, make

a report or complaint of disability discrimination to any relevant authority before

31

being terminated.  Although "[p]ursuing one's rights under the ADA constitutes a protected activity," *id*. at 850, the record contains no evidence that Tsuji was pursuing a right under the ADA when employed with Kamehameha Schools.

Moreover -- even assuming there is a question regarding whether Tsuji was pursuing a right under the ADA simply by requesting a schedule change -- there is no evidence of a "causal link" between his termination (which occurred in November 2013) and his last request for a schedule change (in June 2011). Absent any other evidence, this 29-month gap is sufficient to break any link between protected activity and the adverse action.  *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (concluding that a nearly three year gap "does not support an inference of motive"); *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2004) (reasoning that a thirteen-month period is too long to support an inference of causality).

Further, as established above with the ADA claim, even if Tsuji could establish a prima facie case, Kamehameha Schools has proffered a legitimate, nondiscriminatory reason for its action (Tsuji's violation of work policy, sleeping on the job, falsifying security records), and there is no evidence of pretext.  *See,*

32

*e.g.*, *Vasquez*, 349 F.3d at 647 ("[A]ssuming that the transfer is an adverse employment action, [plaintiff] has not shown either a causal link or that the employer's proffered reason was pretextual").

In short, to the extent Plaintiff is claiming illegal retaliation under the ADA, such a claim fails as a matter of law.

## V.  CONCLUSION

For multiple reasons as set forth above, Defendant Kamehameha Schools' Renewed Motion for Summary Judgment, Doc. No. 56, is GRANTED, and Plaintiff's Counter Motion for Summary Judgment, Doc. No. 61, is DENIED. The Clerk of Court shall issue judgment in favor of Defendant and close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 22, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Tsuji v. Kamehameha Sch.*, Civ. No. 14-00206 JMS-BMK, Order (1) Granting Defendant Kamehameha Schools' Motion for Summary Judgment, Doc. No. 56; and (2) Denying Plaintiff Stanley Tsuji's Counter Motion for Summary Judgment, Doc. No. 61